UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION


CLIFFORD PETTY                    CIVIL ACTION NO. 05-1094

VERSUS
                                  DISTRICT JUDGE ROBERT G. JAMES

RETIREMENT PLAN OF
INTERNATIONAL PAPER CO.    U.S. MAGISTRATE JUDGE JAMES D. KIRK


## REPORT AND RECOMMENDATION

This Employee Retirement Income Security Act ("ERISA") case,
29 U.S.C. 1001 et seq., is referred to me by the district judge for
Report and Recommendation.  The case is ready for decision on
briefs on the merits in accordance with the ERISA Case Order [Doc.
#15].

## Facts

Claimant, Clifford Petty, born September 28, 1945, began work
for International Paper Company (IP) on April 1, 1969. Petty's job,
at the time he left his employment in October of 2003, was in the
maintenance department of the paper mill, a job he had been doing
since 1972. The job required sitting, standing, walking, stooping,
and climbing according to claimant. According to the employer, the
job required frequent sitting and walking and continuous standing,
continuous lifting and frequent carrying, sometimes of very heavy

objects.  The  employer  also  reported  that  the  job  required continuous  pushing  and  pulling,  frequent  climbing  and  occasional stooping,  kneeling  and  crawling.(AR 284) Petty  left  work  because  of pain  in  his  back,  left  hip  and  leg,  especially  his  knee.  Petty  had received  injuries  to  his  hip  and  leg  while  serving  as  an infantryman  in  the  Army  in  Vietnam  in  1967.  Petty's  formal  training is  vocational  training  in  welding.

Petty  filed  an  application  for  benefits  under  the  short  term (Sickness  and  Accident)  plan  offered  by  his  employer  and  insured  by Wausau  Benefits  which  also  serves  as  the  Plan  Administrator. Claimant  also  filed  an  application  for  benefits  under  IP's  long term  (Disability  Retirement)  Plan.  The  Summary  Plan  Description lists  IP  as  the  Plan  Administrator.[1]  Both  the  short-term  and  the long  term  plans  will  be  referred  to  as  the  Plan.  The  Attending Physician's  Statement  (AR 226)  signed  by  Dr.  Carter  Cox,  claimant's treating  physician  and  who  is  also  the  company  physician,  on November  5,  2003  in  connection  with  claimant's  application  for Sickness  and  Accident  benefits,  lists  Petty's  diagnosis  as "degenerative  arthritis,  leg  &  lumbar  pain".  The  form  indicated

---

[1] Because the short term plan in its entirety is not a part of the record I cannot determine with certainty whether Wausau is the insurer or was simply contracted to assist in the claims review process. In any event, it appears that Wausau ,made the decisions regarding entitlement to benefits under the short term plan. The long term plan allows IP's board to select the Administrator. The correspondence denying long term benefits in this case is from IP's "Pension Services" department.

Ordinarily the plan is the proper party defendant. 29 U. S. C. 1132(d)(2). Where the employer is the Administrator or makes the decision to deny benefits, it too is a proper party defendant in an ERISA suit. Musmeci v. Schwegmann Giant Supermarkets, Inc., 332 F.3d 339 (5th Cir. 2003). The issue of the proper party defendant has not been raised, except implicitly by defendant who argues the issue of short term benefits is not before the court. Here claimant sued the Plan(s) which appears correct to raise issues both regarding the short term and long term plans.

that claimant was under Cox's care for his complaints and that Petty is unable to perform the functions of his position.

After leaving his job on October 17, 2003, claimant completed a short term disability (Sickness and Accident) benefits application in November and began receiving benefits. However, in February, 2004, the company terminated benefits. The company advised Petty that the reason for the termination was that "[n]o objective clinical data was provided that documented severity of symptoms that would necessitate total disability. Only brief clinical notes were provided [by your physician]." The letter contained an incorrect statement of the definition of disability. Four days later, the company mailed Petty a letter which stated that he might be eligible for Disability Retirement (long term) benefits and enclosed an application for him to complete.

Petty appealed the denial of short term benefits which were again denied on April 27, 2004. On May 15th Petty filed his application for long term benefits. On May 25th, Petty filed a second appeal of the denial of short term (Sickness and Accident) benefits. The application for long term benefits was denied on June 28th. The reason given by the company was "that you do not meet the requirements of 'totally and permanently disabled' specified by the Plan . . ." Specifically, the denial letter explained that [y]ou must have exhausted your Sick (sic) and Accident (S&A) leave period. Our records indicate that your S&A was denied in January

3

2004; therefore you did not exhaust all of the S&A period that is required for Disability Retirement." The second appeal of short term benefits was denied on July 20, 2004. Petty appealed the denial of long term benefits and on September 2, 2004, Petty was notified that his appeal of disability retirement (long term) benefits had been denied on August 17, 2004.

On March 17, 2005 Petty was found to be permanently and totally disabled by the Social Security Administration as of his last day at work, October 17, 2003 and entitled to benefits.

## Standard of Review

In accordance with this court's standing ERISA Case Order, the parties agree that the Group Long Term Disability Plan issued by defendant, IP, is an employee welfare benefit plan, as defined by the provisions of ERISA, and that this case is governed by ERISA and that all state law claims are preempted.  The parties also have stipulated that the Plan provides the administrator with discretionary authority to interpret the provisions of the Plan and to make findings of fact and determine eligibility for benefits.[2] Both Claimant and Defendant agree that the administrative record is complete. However, because the administrators of the short term plan and of the long term plan are conflicted, the court will  give a modicum less deference to the administrators' decisions.  Vega v.

---

[2] Nevertheless, in brief, Petty suggests that the decisions of the Administrator should be reviewed de novo.

4

National Life Insurance Services, Inc., 188 F.3d 287, 299 (5th Cir. 1999).

## The Plan

Sickness and accident (short-term) disability benefits:

Weekly Sickness and Accident benefits will be payable if you become totally disabled, which means you are unable to perform your job as a result of a non-occupational sickness or injury and are under the regular care of a physician licensed to practice medicine. AR 140

Disability Retirement (long-term) disability benefits:

Disability or Disabled means a total disability which is a medically determinable physical or mental impairment or diagnosed terminal illness which renders the Participant incapable of performing any occupation or employment for which the Participant is qualified by education, training or experience and which is likely to be permanent during the remainder of the Participant's life, provided that the Plan Administrator finds, and a physician or physicians designated by the Plan Administrator certify, that the Participant is Disabled. AR 119

## The Medical Records

The medical records show that claimant had complained of and had been diagnosed with hip and knee problems for many years before

he left work at IP. Veterans Administration (VA) records presented to the Administrator after its termination of claimant's benefits shows that in April 2002 Petty had worn out cartilage in his left knee. He had seen a chiropractor since 1990 for low back pain and was diagnosed with intervertebral disc syndrome with radiculitis. He had right sciatica[3] and also mild degenerative joint disease of both hips. An MRI in March 2001 did not reveal any aseptic necrosis[4] of the femoral head on the left and no evidence of joint fluid or of significant arthritic changes. Examination of the hip was essentially normal.

At the time claimant complained of radiating pain down the right lower extremity and constant left hip pain at a level of 6 out of 10 and, when walking, 10 out of 10. Petty also complained that his left knee sometimes buckled when walking. On examination, Petty had difficulty squatting and complained of severe discomfort in the low back. On examination of the hips claimant complained of pain and had limitation of flexion, adduction, rotation and external rotation.

Examination of Petty's left knee revealed no swelling or tenderness, testing was negative and there was no noted instability or atrophy.

---

[3]  Pain along the course of the sciatic nerve. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[4]  Tissue death. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

In summary, the VA concluded that Petty had some loss of range of motion in the left hip and right knee. He was diagnosed with degenerative disc disease, mild degenerative joint disease in the left hip and a normal left knee examination.

In January, 2003 VA records show that claimant had questionable mild sclerosis[5] of the right sacroiliac joint and questionable pseudo widening and mild sclerosis of the left SI joint. He had spurring of his lumbar vertebrae "which could represent spondyloarthropathy"[6]. He was diagnosed with "flowing osteophytes"[7] with some fusion of them. It was thought his left hip pain could be due to these conditions. Petty was also found to have "a broad bulge of the annulus and some mild posterior hypertrophic spurring" of his low back at L3-4 and at L4-5 with some foraminal[8] encroachment bilaterally.

In February of 2003 Petty complained that his knee was locking, giving way and popping when he walks and  was found to have a large amount of fluid on his knee and a torn lateral meniscus with degenerative disease.

---

[5]   Sclerosis is hardening of tissue. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[6]   A disease affecting the joints of the spine. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[7]   As used here, a  bony outgrowth of the vertebrae caused by arthritis. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[8]   The foramina are the openings in the vertebral bodies through which nerves exit from the spinal cord. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

In April of 2003 an MRI of the left knee showed degenerative changes including mild joint effusion[9] with some synovitis[10] and thickening of the synovial membrane, degenerative changes in the medial meniscus[11] with mild irregularity of the tibial articular margin[12] without tear, mild chondromalacia[13] of the kneecap and some bursitis. No internal derangement of the knee was noted. Claimant reported that the left knee and hip pain had progressed since his Vietnam injury and that his left knee was giving way more often. A tear of the medial meniscus was diagnosed and in May surgery was recommended. X-rays of the SI joints showed sclerosis and arthritic change in both hips.

After the claim for Sickness and Accident benefits was filed by claimant, his treating physician, Dr. Carter Cox, was contacted by the Administrator. Dr. Cox reported Petty's long history of pain in his low back and hips and in other joints of his body. He confirmed plaintiff's diagnoses of mild diabetes and hypertension.

---

[9] Fluid on the knee, usually caused by osteoarthritis.  See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[10] Inflammation of a synovial (fluid secreting) membrane, usually with pain and inflammation of the joint.  See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[11]The menisci are C-shaped fibrous pieces of cartilage which are found in the knee and certain other joints and forms a buffer between the bones to protect the joint. The menisci also serve as  shock absorbing cartilage of the knee, assist in lubricating the joint and limit flexion and extension.  See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[12] The outside edge of the portion of the joint formed by the tibia. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[13] An abnormal softness of cartilage. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

Cox stated that X-rays confirmed osteoarthritis in his hips and an MRI of the hip showed no abnormalities. Cox's opinion was that Petty was disabled to perform his duties as a millwright due to his arthritis.

In January 2004 the claim was sent for "peer review analysis" and the Orthopedist who performed the review spoke with Dr. Cox. He reported that Dr. Cox said Petty had degenerative disc disease and spondylosis[14].  He also said Cox "provided brief responses that did not answer my questions. I tried to elicit objective clinical data but could get nothing beyond the comments documented here." The reviewing doctor concluded that "[t]he diagnosis of degenerative arthritis, leg and lumbar pain do not substantiate the total disability status requested for the listed duration."

On January 26, 2004, claimant complained to the VA of left knee and hip pain. The records note that a left knee arthroscopy had been scheduled in May of 2003 but was cancelled at the request of Mr. Petty. The notes detail the MRI of February 20, 2003 and record claimant's statement that his knee buckles. Range of motion of the knee was limited and he had crepitus[15] of the left knee and hip with slight effusion. He had an antalgic gait and was noted to limp on the left.   In addition, an osteophyte was found on the

---

[14]  Degenerative disease of the spine. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

[15]  A grating or crackling sound or sensation. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

kneecap. X-rays of the hip showed some sclerotic changes in the acetabulum[16] bilaterally.  The diagnosis was degenerative joint disease of the left knee and hip.

On February 20, 2004 Petty returned to the VA with continuing pain in his hip, lower back and left knee. He had limited range of motion of his back on physical exam and "[m]uch difficulty in performing squat." At that time, he was prescribed a knee brace.

On February 25, 2004, after claimant's benefits had been terminated on February 12th, Dr. Cox completed a functional assessment form which showed that claimant had a "severe limitation of functional capacity" and was capable of only sedentary work. The doctor reported that claimant had back and leg pain, degenerative arthritis of the lumbar spine and hypertension, diabetes and gout. Cox limited Petty to standing and walking 30 minutes in an 8 hour day, sitting 1 to 3 hours, lifting a maximum of 10 pounds and no repetitive motions. Claimant was limited to no bending, stooping or climbing.

On March 5, 2004 a "functional assessment form" was completed by a VA certified adult nurse practitioner, Christine Liberto. That form shows a history of a lateral meniscus tear according to the February 20, 2003 MRI, and arthralgia of the left knee and hip. The nurse practitioner confirmed that physical findings on X-ray

---

[16]  The cup shaped socket in the hip bone. See www.Medlineplus.gov, a service of the National Library of Medicine and the National Institutes of Health.

included arthritic changes in the knee, hip and lumbar spine. The nurse practitioner specifically referred the Administrator to the records of the VA Medical Center. The nurse practitioner explained that Petty was disabled from performing any occupation based on MRI, X-ray results and a physical examination. Petty's physical limitations remained the same.

On March 24, 2004, Dr. Cox mailed a detailed letter to the Administrator outlining the history and course of treatment of Mr. Petty. Dr. Cox again reported Petty's long history of back, leg and hip pain. Dr. Cox again referred the Administrator to the VA for additional medical information. He confirmed that more than one MRI had indicated degenerative joint disease and confirmed the left knee pain. Dr. Cox reiterated the claimant's limitations and his opinion that Petty was disabled.

On April 21, 2004, the Administrator reported a second orthopedic review of the claim. The reviewer called Dr. Cox but reported that the doctor was unable to provide any additional information. He also attempted to call the VA doctor without success.  The reviewer concluded, without having spoken to the VA nurse practitioner or having reviewed the VA medical records to which it had been referred more than once, that "[t]here is insufficient information to establish the medical necessity of the disability. * * * There is no comprehensive orthopaedic history and physical examination to delineate the course for the patient's

problems, onset, duration, aggravating factors, physical findings, location and quality of pain, strength, range of motion of joints, stability, gait patterns, neurological status, etc. Nor is there any specific diagnosis for his back and hip complaints. 'Back and hip pain' are not diagnoses. Without objective details, it is not possible to make a clear determination as to the level of the patient's disability."

The letter asserts that, although the findings could support a torn meniscus, they do not correlate the findings to objective findings on physical examination and history. He reports there are no descriptive reports of standard radiography of the spine, hips or knees and no MRI of the spine. He suggests that, without such information, "it cannot be determined as (sic) to (sic) what diagnosis is responsible for 'back and hip pain' . . . ."

The reviewer suggests that other conservative treatment should be attempted before declaring claimant disabled (such as a knee brace). The reviewer admits, however, that:

Be that as it may, an isolated torn lateral meniscus that remains untreated can produce enough disability that would make this patient unable to perform at the level that his job description requires. Standing for the bulk of an 8 hr work day would be difficult. Other functional limitations relating

12

to a torn meniscus are climbing and squatting which are not[17]
included in the job description. * * *

On June 28, 2004, claimant, through his attorney provided
another copy of the VA medical information to which the
Administrator had been twice referred.

Another peer review analysis was reported on July 16, 2004 in
regard to the second appeal of the denial of Sickness and Accident
benefits. That review was made by the first orthopedic surgeon
reviewer. At that time, the VA records were reviewed.[18] That review
recounted the numerous objective tests that had been performed
regarding the low back, hips and left knee. The reviewer concluded
that the tests "do not substantiate the total disability status for
the dates in question."[19]

On July 27, 2004, the VA confirmed claimant's continued
complaints and his inability to work.

## Review for Abuse of Discretion

Petty contests the administrator's interpretation of the Plan,
see Wildbur v. ARCO Chem. Co., 974 F.2d 631 (5th Cir. 1992) and,

---

[17] In fact, climbing and "stooping" are. See AR 284.

[18] The records had been provided twice, as reflected in the AR—first by Dr. Cox with his March 24, 2004 letter (those records show a date of "03/02/2004" on them) and second by Petty's attorney on June 28, 2004 (those records show a date of "06/24/2004" on them).

[19] Curiously, the reviewer seems to concentrate on whether the conditions are related to his Vietnam service injury. While that was an important consideration for the VA, it has no bearing on claimant's entitlement, *vel non*, to disability benefits under the IP Plan. AR 146-148

through counsel, argues that there does not exist in the record substantial evidence to support the decision of the administrator.

Defendant argues 1) that the denial of short-term (Sickness and Accident) benefits is not before the court because claimant did not allege entitlement in his complaint, and 2) the Administrator did not abuse its authority in finding Petty was not elible for Disability Retirement benefits.

Eligibility for benefits under any ERISA plan is governed by the plain meaning of the plan language. Threadgill v. Prudential Securities Group, Inc., 145 F.3d 286 (5th Cir. 1998). In determining whether an administrator abused its discretion, we look to whether that administrator was arbitrary or capricious. "An administrator's decision to deny benefits must be 'based on evidence, even if disputable, that clearly supports the basis for its denial." Lain v. UNUM Life Ins. Co. of America, 279 F.3d 337, 342 (5th Cir. 2002). There must be "concrete evidence" in the administrative record that supports the denial of the claim. Id. The administrator's decision should be reversed only if it is arbitrary or capricious, that is, if the record lacks substantial evidence to support the Plan Administrator's benefit determination. See Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc., 168 F.3d 211, 215 (5th Cir. 1999). See also Vega v. Nat'l Life Ins. Servs., 188 F.3d 287, 299 (5th Cir. 1999).

14

1) <u>Are the short-term claims before the court?</u>

_____Defendant suggests that Petty's complaint does not set forth a claim for short term benefits. The basis for denial of long-term (Retirement Disability) benefits was, however, based entirely upon the fact that Petty had not exhausted short term benefits (an issue which will be fully addressed below). It is disingenuous to suggest that the two types of benefits are so entwined that receipt of one benefit is required in order to receive the other and yet, at the same time, argue that the two should be separated for purposes of suit. There is but one administrative record which deals with both claims and the same medical information in the administrative record was available for consideration of both claims. Further, the complaint specifically refers to short-term benefits and alleges entitlement to "disability benefits pursuant to the Plan." The Plan provides for both short-term and long-term benefits. Finally, under defendant's apparent[20] interpretation of the Plan, it is impossible to determine eligibility for long-term benefits without also determining eligibility for short-term benefits. I find that the complaint is broad enough to include a request for all benefits owed claimant, whether short-term or long term and all claims are properly before this court.

---

[20] See discussion infra, beg. p. 22.

15

2) Is claimant entitled to short-term (Sickness and Accident) benefits?

The initial denials and the  denials of reconsideration or appeal by Wausau were all expressly based on the lack of objective medical evidence to support a finding of disability. Such a basis for a disability determination may constitute "substantial evidence" or "concrete evidence". See Mouton v. Fresenius Medical Care of North, 2003 WL 22287522 (5th Cir. 2003), Dubose v. Prudential, 2003 WL 23021934 (5th Cir. 2003)(unpublished), Chandler v. Hartford, 2006 WL 1209363 (5th Cir. 2006)(unpublished),Ruiz v. Continental Casualty Co., 400 F.3d 986 (7th Cir. 2005), Johnson v. Metropolitan, 437 F.3d 809 (8th Cir. 2006), Wangenstein v. Equifax, Inc., 2006 WL 2220822 (11th Cir. 2006)(unpublished).

Further, where the plan puts the burden on the claimant to prove that he is disabled, it is implicit in the requirement of proof that the evidence be objective.

Sickness and Accident benefits were  initially awarded to Petty. When they were terminated four months later, nothing had changed. It appears from defendant's letter to Petty that, perhaps, the company applied an incorrect definition of disability to his claim. The definition of disability in the Plan is:

Weekly Sickness and Accident benefits will be payable if you become totally disabled, which means you are unable to perform your job as a result of a non-occupational sickness or injury

16

and are under the regular care of a physician licensed to practice medicine. AR 140 (Emphasis added)

Defendant's letter terminating benefits recited the definition as:

Weekly Sickness and accident benefits are payable through International Paper's disability plan if you become totally disabled as a result of a non-occupational sickness or injury, you are under the care of a physician licensed to practice medicine, and there is medical necessity for lost time from work.

Applying the second definition would have required more proof than the Plan actually required. Putting this issue aside for the moment, I am nevertheless convinced that the Administrator abused his discretion in terminating Sickness and Accident benefits. The basis for the initial termination was that objective medical evidence did not support the claim. Yet, at the time of termination, the Administrator did not have and had not reviewed the extensive medical records from the VA. Even after being referred to them more than once[21], the Administrator did not obtain the records. One reviewer attempted to call the VA nurse practitioner on one occasion but never tried again and did not follow up. Apparently the reviewer felt he needed to speak with the

---

[21] By claimant (date unknown) AR 300, by nurse practitioner Liberto in February 2004 AR 292, and by Dr. Cox in March 2004 AR 301.

17

VA nurse practitioner, but when he couldn't, simply recommended denial of the claim. Similarly the records reflect that questions were asked of Dr. Cox and satisfactory answers were not received; yet the reviewer did not say what the questions were or what information he needed. While the burden is not solely on the administrator to generate evidence relevant to deciding the claim, Gooden v. Provident Life & Acc. Ins. Co., 250 F.3d 329 (5th Cir. 2001); Vega v. National Life Ins. Services, Inc., 188 F.3d 287 (5th Cir. 1999) if there was evidence the Administrator needed from Dr. Cox or from nurse practitioner Liberto, it should have followed up to obtain it, or simply placed the burden on the claimant to obtain it. However, here claimant could not have known what it was the Administrator wanted to know from Dr. Cox or from Liberto because the reviewer did not say.

Eventually, however, the Administrator did receive a copy of the VA medical records from Dr. Cox in March of 2004. He received a second copy from claimant's attorney in June. This evidence was required to be considered by the Administrator as long as he was provided a fair opportunity to review it. Vega, supra.

The reviewers' statements that there was no objective medical evidence and no diagnoses is puzzling. The medical records, recited above, reflect longstanding diagnoses of intervertebral disc syndrome in claimant's low back, including bulging discs impinging somewhat on the foramina with radiating pain. Degenerative joint

18

disease (osteoarthritis) was diagnosed as to claimant's hips. He had been diagnosed with degenerative changes in his knee including the medial meniscus, a torn lateral meniscus, synovitis, bursitis and chondromalacia of the knee. Arthritic change with sclerosis was diagnosed as to both SI joints.

Objective medical evidence included X-rays of the hip showing osteoarthritic changes and sclerotic changes, X-rays of the back showing spurring and "flowing osteophytes", X-rays of the knee showing a patella osteophyte, an MRI of the knee suggestive of a meniscus tear and a later MRI showing effusion, synovitis, hypertrophic changes, degenerative change of the medial meniscus, chondromalacia and bursitis, an MRI of the low back showing bulging discs at two levels with some encroachment on the foramina and physical examinations showing limited range of motion of the back, knee and hips, and difficulty squatting, crepitus of the left knee and hip fluid on the left knee and antalgic gait and limp.

While these diagnoses and objective findings do not necessarily equate to disability, in this case, they are well correlated with claimant's longstanding subjective complaints. In addition, they show that the basis for the reviewers' recommendations-that there was no supporting diagnoses or objective medical evidence-is simply wrong.

Similarly, the reviewer's observations on April 21, 2004 that there was no comprehensive orthopedic history or physical

examination, onset, physical findings, location of pain, range of motion, gait or neurological status is simply mistaken. All are in the VA records. The recommendation for pain management is also puzzling since such had been done for years. The same is true with regard to that reviewer's recommendation for a knee brace. One had been prescribed at the VA in February of 2004.

Perhaps most telling is the lack of mention in the letters denying benefits of the reviewer's findings regarding the meniscus:

Be that as it may, an isolated torn lateral meniscus that remains untreated can produce enough disability that would make this patient unable to perform at the level that his job description requires. Standing for the bulk of an 8 hr work day would be difficult. Other functional limitations relating to a torn meniscus are climbing and squatting which are not included in the job description. * * *

The torn meniscus was diagnosed in February 20, 2003 by MRI as shown by the VA medical records.[22]

In addition to the objective findings and the diagnoses being correlated with claimant's subjective complaints, those complaints have not been shown to be inconsistent with any medical evidence in

_____

[22] Although it was suggested by a reviewer that such condition could be corrected by surgery, defendant has not argued that surgery should be mandated. In any event, the defendant has pointed to no provision in the Plan requiring a claimant to undergo surgery and I have found none. In the absence of such a Plan provision, I will not place such a requirement upon the claimant.

the record. Nor has there been any suggestion by anyone in the record that this 34 year employee is exaggerating or malingering.

The claimant's complaints and his disability is supported by his treating medical providers' opinions and tests. Although there is no treating physician rule applicable to ERISA cases, <u>Black & Decker Disability Plan v. Nord</u>, 123 S.Ct. 1965 (2003), here the reviewing physicians have not refuted the treating physicians nor have they even disagreed with their medical opinions; rather they based their recommendation of denial of benefits on their erroneous belief that there were no supporting diagnoses or objective findings. Compare <u>Chandler v. Hartford Life</u>, 178 Fed.Appx. 365, 2006 WL 1209363 (5th Cir. 2006).

Finally, the only evidence of claimant's functional capacity is that provided by Dr. Cox and nurse practitioner Liberto. Those opinions are easily consistent with the diagnoses and objective findings in the record. The limitations set forth in those evaluations, when compared with claimant's job duties, show that claimant is and was as of October 18, 2003 unable to perform his job.

Therefore, Sickness and Accident disability benefits should be ordered paid based on a disability date of October 18, 2003 for the period outlined by the Plan.

      <u>3) Must Sickness and Accident benefits be exhausted in order</u> <u>to claim entitlement to Retirement Disability benefits?</u>

The Administrator (Pension Services) denied Disability Retirement benefits on the basis that Petty had not exhausted Sickness and Accident benefits. AR 68 The letter to Petty denying benefits stated "[y]ou must have exhausted your Sick (sic) and Accident (S & A) leave period. Our records indicate that your S & A was denied in January 2004; therefore you did not exhaust all of the S & A period that is required for Disability Retirement." AR 68 In the letter denying his appeal, the reason is repeated: "[y]ou must have exhausted your Sick (sic) and Accident (S & A) leave period. Our records indicate that your S & A was denied in January 2004; therefore you did not exhaust all of the S & A period that is required for Disability Retirement." AR 101

The statements in the two letters, which statements are identical, are somewhat ambiguous. The first sentence implies that what matters is exhaustion of the leave <u>period</u>. The second sentence, however, could be read to suggest that benefits must actually have been received in order to have exhausted, for it refers to the fact that benefits were denied. If all that matters is the leave <u>period</u> then it is irrelevant that short term benefits were denied. Further, because the letter denying the appeal concerns a decision in August, it is not clear whether the benefits period had exhausted at that point in time. A complete copy of the

22

short term (Sickness and Accident) plan is not in the record. The portions of that plan which are in the record provide the definition of disability and the fact that benefits are for 26 weeks. What is not apparent is when the benefits begin. Notes in the record indicate that the Sickness and Accident "end date" would have been 39 weeks after disability began, which would have been July 17, 2004 according to the note. AR 38 Therefore, at the time of the denial of the appeal in August and the letter notifying Petty of the denial on September 2, 2004, the "period" would have been exhausted. Because benefits were nevertheless denied, it can be inferred that the Administrator was interpreting the plan to require actual receipt of short term benefits as a prerequisite to receiving long term benefits.

On the other hand, that the Administrator might have been interpreting the Plan to require that only the period of time need be exhausted is supported by the fact that after the short term benefits were denied, the company sent Petty a packet of information and application for long term benefits. That the Administrator interpreted the plan only to require exhaustion of the period of time and not actual receipt of benefits is also implied by the fact that notes in the Administrator's record state that the claim is exhausted. See, for example, AR 124, 129.

Where an Administrator's interpretation of the Plan is an issue, the Fifth Circuit has directed the application of a two-part

test. First, a court must determine the legally correct interpretation of the plan. If the administrator did not give the plan the legally correct interpretation, the court must then determine whether the administrator's decision was an abuse of discretion. In determining whether the interpretation was legally correct, the court must consider 1) whether the administrator has given the plan a uniform construction, 2) whether the interpretation is consistent with a fair reading of the plan, and 3) any unanticipated costs resulting from the different interpretations of the plan. If the administrator's interpretation is found to be legally incorrect, then the court must determine whether it abused its discretion. Three factors are important to this analysis: 1) the internal consistency of the plan under the administrator's interpretation, 2) any relevant regulations formulated by the appropriate administrative agencies and 3) the factual background of the determination and any inferences of lack of good faith. See <u>Wildbur v. ARCO Chemical Co.</u>, 974 F.2d 631 (5th Cir. 1992); <u>Gosselink v. AT&T, Inc.</u>, 272 F.3d 722 (5th Cir. 2001).

The Plan provides:

"Disability" or "Disabled" means a total disability which is a medically determinable physical or mental impairment or diagnosed terminal illness which renders the Participant incapable of performing any occupation or employment for which the Participant is qualified by education, training or

experience and which is likely to be permanent during the remainder of the Participant's life, provided that the Plan Administrator finds, and a physician or physicians designated by the Plan Administrator certify, that the Participant is Disabled.

"Disability Retirement Date" means the first day of the month subsequent to the Participant's exhaustion of Company-paid short term disability benefits or, if the Participant receives any other type of benefits for a disability instead of Company-paid short term disability benefits (for example, Worker's Compensation benefits), the first day of the month subsequent to the date the Participant would have exhausted Company-paid short term disability benefits has such benefits been paid, provided on such date the Participant is determined to be Disabled.

If the Administrator's interpretation of this plan language is that it requires that a Participant actually receive short term (Sickness and Accident) benefits in order to become eligible to receive long term (Disability Retirement) benefits, the interpretation is not legally correct and, because it directly contradicts the plain meaning of the Plan language, is an abuse of discretion. In other words, such an interpretation is not

consistent with a fair reading of the Plan for the following reasons.

The requirement of exhaustion is found not under the definition of disability, but under the title of "disability retirement date". It is clear that the provision is intended only to serve as a method for determining at what point in time a person may begin drawing Disability Retirement benefits. For it makes no sense and serves no legitimate purpose to require that a person actually receive benefits under the short term plan before he can receive benefits under the long term plan. Indeed, the two definitions of disability are different. To be eligible for short term benefits, the disability must be as a result of a non-occupational sickness or injury and the applicant must be under the regular care of a physician. For long term benefits, there are no such requirements. Therefore, a person who receives an occupational injury but who, for some reason may not be entitled to receive "other . . . benefits", such as workers compensation benefits, would be unable to receive long term benefits. Similarly, a person who is disabled but is not under the care of a regular physician-- for example, because the injury is permanent and does not require further medical care—would not be entitled to receive short term benefits, and thus could never receive long term benefits. Such absurd results could not have been intended by the drafters of the Plan.

To interpret the Plan in such manner means that a person covered by the long term plan would never have his disability determined according to the definition of long term disability in the Plan, but would only have it determined by the definition of short-term disability. Thus if a person could not meet the definition of short term disability, he could never meet the definition of long term disability. A more reasonable[23] application of the Plan language is that it is, as its title suggests, simply a means of determining when disability retirement benefits accrue. In any event, it is clear from the Summary Plan Description that actual receipt of benefits is not required in order to exhaust Sickness and Accident benefits. See AR 8. That is the legally correct interpretation.

The defendant either incorrectly interpreted the Plan to require actual receipt of benefits, or failed to properly consider the appeal after the benefits <u>period</u> had exhausted. Once the period had run, defendant should have considered the medical evidence and the definition of disability in order to determine whether Petty is disabled under the definition of disability. Such failure was an abuse of discretion.

<u>     4) Should the case be remanded?</u>

Remand would serve no purpose as far as the determination of claimant's medical diagnoses and limitations. However, because the

_____

[23] See <u>Garcia v. Lumacorp, Inc.</u>, 429 F.3d 549 (5th Cir. 2005).

27

Administrator denied long term benefits for the procedural reason that Sickness and Accident benefits had not been exhausted, there exists in the record no vocational evidence from which to determine whether claimant is totally disabled from any job for which he is qualified as required by the Plan.   Dr. Cox's and nurse practitioner Liberto's opinions are that Petty is disabled from any job. However, it is questionable whether they have the vocational training to offer such opinions. Therefore, this case must be remanded for the limited purpose of making that determination, based on the medical evidence, functional capacities assessments (AR 404, 410-413 and 415-419) and vocational evidence.

### Conclusion

For the foregoing reasons, the Court finds, after reviewing the record and considering Wausau's dual role as insurer[24] and plan administrator, that the decision of the Administrator as to short term (Sickness and Accident) benefits is not supported by substantial and concrete evidence and is thus  arbitrary and capricious and an abuse of discretion.  The case should be remanded to the Administrator for the purpose of awarding benefits based on a disability date of October 18, 2003 for the period provided by the Plan.

Further, the decision of the Administrator (Pension Services) as to long term (Disability Retirement) benefits is not supported

---

[24]  See footnote 1.

28

by substantial and concrete evidence and is arbitrary and capricious and an abuse of discretion. This case should be remanded to the Administrator for the limited purpose of determining whether, based on the medical evidence, and the functional capacities assessments in the record, claimant is disabled. Vocational information may be obtained by the Administrator and by the claimant for consideration by the Administrator.

This is a special circumstance[25] where remand to the administrators is appropriate.[26]

IT IS RECOMMENDED that this case be remanded to the Administrators for further consideration as described above, that this court retain jurisdiction in the case, and that the Clerk be ordered to administratively close the case, subject to reopening on timely motion of either party. The administrators should be given 120 days within which to complete their review, award short term benefits, and render a decision regarding long term benefits. Should plaintiff wish to submit vocational evidence, that should be done within 60 days. Either party should be allowed to move to reopen this proceeding within 180 days.

[25] Vega, 188 F.3d at 302, n.13.

[26] For short term benefits remand is required in order to compute the period of benefits due. For long term benefits remand is necessary in order to apply the definition of disability to the medical evidence and, perhaps, for the consideration of vocational evidence.

**OBJECTIONS**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have five (5) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within five (5) days after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes his final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FIVE (5) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT UPON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UN-OBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, in Alexandria, Louisiana, on this the 29th day of May, 2007.

_____
JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE